# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**JADAEL INC.,**

**Plaintiff,**

-vs-                                                    Case No.  **6:05-cv-1623-Orl-DAB**

**DAVID S. ELLIOTT, ALLISON ELLIOTT,
and WALLSTREETTEACHERS.COM,
INC.,**

**Defendants.**
_____

# ORDER

This cause came on for oral argument on July 19, 2007 on the following motion:

| | |
|---|---|
| **MOTION:** | **MOTION FOR SUMMARY JUDGMENT (Doc. No. 124)** |
| **FILED:** | **November 29, 2006** |

_____

**THEREON** it is **ORDERED** that the motion is **GRANTED** in part and **DENIED** in part.

Plaintiff Jadael, Inc. ("Jadael") seeks to hold Defendants David S. Elliott ("Elliott"), Allison

Elliott, and Wallstreetteachers.com, Inc. ("WST") liable for misappropriation of trade secrets under

the Uniform Trade Secrets Act, Fla. Stat. § 688.002(4), fraudulent inducement under Florida law, and

infringement of Plaintiff's marks and unfair competition under the Lanham Act, 15 U.S.C. §1125(a).

Between May and September 2005, Jadael and Defendants planned and collaborated on a joint

venture to develop, teach, and market stock trading techniques, but the relationship soured.  Jadael

claims that after the relationship ended, WST unlawfully used and disclosed and, in fact, continues

unlawfully to use and disclose Jadael's stock trading system and related proprietary information.

Jadael further sues Elliott and WST for their alleged breach of a non-disclosure agreement and WST for breach of a letter of intent under Florida law[1] related to Defendants alleged disclosure, use, and failure to return components related to Jadael's stock trading system.  Jadael seeks damages on his claims of fraudulent inducement, breach of the agreement and letter, and both injunctive relief and damages on his trade secret and Lanham Act claims.  This matter comes before the Court on Defendants' motion for summary judgment on all claims.  Doc. No. 124.

## I.      STANDARD OF REVIEW ON SUMMARY JUDGMENT

A  court  will  grant  summary  judgment  if  "the  pleadings,  depositions,  answers  to interrogatories, and admissions on file together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  Material facts are those that may affect the outcome of the case under the applicable substantive law.  Disputed issues of material fact preclude the entry of summary judgment, but factual disputes that are irrelevant or unnecessary do not.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of proving that no genuine issue of material fact exists.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986).  In determining whether the moving party has satisfied its burden, the Court considers all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion and resolves all reasonable doubts against the moving party.  *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).  Both the moving party and the party opposing summary judgment "shall provide pinpoint citations to the

---

[1]The non-disclosure agreement and letter of intent provide that Canadian law and New York law governs each agreement, respectively.  *See* Doc. Nos. 67-7 at 9, ¶ 12, 65-3 at 3, ¶ 17.  The parties have stipulated, however, that Florida law applies to Jadael's claims for breach of the agreement and letter.  *See* Doc. No. 162 at 5.

pages and lines of record supporting each material fact."  Doc. No. 101 at 6, ¶ II(G).  "General references to a deposition are inadequate."  *Id.*

## II.    BACKGROUND[2]

In this case, Jadael essentially seeks "ownership" of a tool to analyze the stock market.  Jadael does not seek to sell the tool directly, but rather, to sell seminars that teach others *about* the tool.  Analysis of the stock market for these purposes, or "technical market analysis," involves the study of past financial market data to forecast future price movement and decide when to trade.  In general, in order to predict price movement, traders use various charts, methods, and technical indicators.  A "trading system" consists of a one or a combination of these charts, methods, and indicators, many of which, were developed long ago and can be found in the public domain, on the internet and in books.  One trader may select a particular combination of charts, methods, and indicators, and that particular combination may be considered unique.  Indicators also require the setting of particular frequencies, and thus, two traders may use the same indicators but select different frequencies for those indicators.

Elliott has been an investment counselor and financial markets expert for more than thirty years.  Throughout the years, Elliott developed his own trading systems ("WST trading system") based on a combination of indicators, particular frequencies, and charts that he determined were

---

[2] For the purpose of providing a general factual background, the Court compiled the following facts largely from the parties' pretrial statement (containing a few stipulated facts) (doc. no. 162), the parties' trial briefs (doc. nos. 163, 164), and the testimony of David Elliott and Claude Roy in deposition and at the preliminary injunction hearing (doc. nos. 67, 74).  The parties seem to expect the Court to bear the burden of perusing the voluminous record in order to find support for and to make sense of their vague arguments and claims, not just on summary judgment, but also at trial.  They never presented the undisputed (or disputed, for that matter) facts in a clear and logical way.  Indeed, Defendants' motion for summary judgment is almost entirely devoid of pinpoint citations to the record, and, confusingly, is nearly identical to Defendants' trial brief in that both are largely comprised of arguments regarding disputed facts.  *Compare* Doc. No. 124 *with* Doc. No. 164.  In turn, Defendants' failure may have been induced , in part, by Jadael's inability to delineate clearly its own claims in this case (discussed further below).

effective based on his experience and research.  His trading system changed over time, and continued to evolve, even throughout this litigation.

WST, of which Allison Elliott is the sole officer, director, and majority shareholder, is a Florida corporation that organizes and conducts seminars and markets products related to stock trading and other investments.  Elliott, who also owns WST, has taught and is currently teaching most of WST's seminars, which teach the basic concepts of technical market analysis, as well as the WST trading system.  On average, approximately twenty to thirty students attend each WST seminar.  WST has copyrighted some of the names and descriptions of the indicators and techniques associated with the WST trading system, including SOAP, MOBO, MAP, CCI (Commodity Channel Index), and SnapBacks.  *See* Doc. No. 28-2.

In addition to teaching seminars, Elliott also hosts chat rooms on TCNet and HotComm, two internet servers.  In these chatrooms, Elliott leads discussions and answers questions about stock trading and other trading techniques through live voice and text chats.  Approximately 2,000 members participate in his TCNet club, the FirstWave Club ("FW Club").  Defendants' HotComm service, which was free for the first month followed by a monthly fee, allowed WST students to follow-up on the seminars.  Elliott hosted discussions; gave presentations; answered questions; and also presented components of his trading system and related charts.

Defendants also operate a "Mentor Center" as part of the Yahoo network.  As part of the Mentor Center, Elliott makes market predictions each day, and sends them by e-mail to the Center's approximately 4,100 to 4,200 subscribers. Elliott advertises WST seminars through the FW Club and in his daily Mentor Center emails.

-4-

Claude Roy founded, owns, and is the sole principal of Jadael, a Canadian corporation. Roy has a background in physics and mathematics, particularly concerning fractal geometry. Prior to encountering the Defendants, in 1995, Roy became interested in market analysis, and in 2002, Roy left his job to pursue technical market analysis as a career. Roy attended several trading seminars in Canada, and began to study and research stock trading methods, indicators, and techniques developed by other traders, and decided to apply his scientific and mathematical background to technical market analysis. Using his knowledge of the principles of fractal geometry, Roy began modifying existing technical indicators. This study and research marked the beginning of the development of Roy's own trading system ("Trading System"), the main subject of this case.

Roy attended WST's Advanced Equity Trading Seminar in May and October 2004, and purchased the WST's "Snapback CD" in August 2004. Roy was a frequent and valuable contributor to WST's TCNet chatroom, and as a result, Roy and Elliott began communicating. Between May and September 2005, Roy and Elliott discussed the possibility of a joint venture between WST and Jadael in which the parties might collaborate by planning and teaching seminars together, and then by marketing software products related to the seminars. Roy and Elliott conducted most of their discussions over the internet – either through e-mail or internet chat conversations on Skype, an internet protocol through which users can participate in both chats or telephone conversations over the internet.

On May 17, 2005, Elliott disclosed to Roy, by e-mail, the WST trading system. Between May and July 2005, pursuant to an oral confidentiality agreement between Roy and Elliott, Roy e-mailed Elliott some of the details and parts of the Trading System and the related trading templates he created. Throughout this time, the Trading System continued to evolve. Roy continued working on

the elements of his Trading System – conducting research and back-testing, writing templates, and creating charts.  As part of his work, Roy took some components of the WST trading system, and made improvements.  According to Roy, he altered these components, so that they were "completely" different from those in the WST trading system.  Even while conceding the many public domain and common elements of his brainchild, Roy contrarily claims that the Jadael Trading System is entirely new and different from the WST trading system due to his efforts.

Before July 2005, Roy did not disclose his entire Trading System because he wished to receive a formal confidentiality agreement and because he wished to protect the secrecy of his work.  In anticipation of disclosing his work to Elliott for the joint venture, Roy drafted a non-disclosure agreement based on a prior agreement he used in another context.  On July 7, 2005, Elliott executed the non-disclosure agreement ("NDA") on behalf of himself and WST.  Doc. Nos. 65-2 at 3, 162 at 4.  Roy did not sign the agreement himself, although the NDA contains a signature line for Roy on behalf of Jadael.  The NDA lists as the "Proprietary Information" of Jadael and Roy a number of modified indicators, trading patterns, overall concepts, templates, software, and studies, which had been or were about to be disclosed to Elliott and WST for the purposes of "exploring a future business relationship with [Defendants]."  *See* Doc. No. 65-2 at 4-6.  This list of "Proprietary Information" is largely comprised of what Jadael currently alleges are components of the Trading System.  *See id.* Under the terms of the NDA, Elliott and WST agreed, *inter alia*: (1) that "Proprietary Information" would not include any information which existed or thereafter became "public domain" (*id.* at 1, ¶ 2); (2) not to disclose the "Proprietary Information to any third party . . . except as may be required [for the purposes of the future joint venture between Jadael and WST]." (*id.*, ¶ 3); (3) that the NDA would remain in effect for the duration of the joint venture and for ten years after (*id.* at 2, ¶ 7); (4) that upon

termination of the "Agreement," the parties would return "all Proprietary Information of the other party . . . and will immediately cease to make further use or disclosure of such Proprietary Information" (*id.*, ¶ 8); and (5) that "[s]oftware and coded material shall be erased from [Elliott and WST's] computers and usage of these shall be stopped" (*id.*).

Upon execution of the NDA, Roy disclosed the Trading System to Defendants through e-mails and chat discussions. Roy disclosed, not only the indicators, techniques, and concepts underlying his Trading System, but also the precise frequencies for his settings. In chat discussions, Elliott asked Roy questions about the Trading System because he did not understand how it worked. Elliott further did not grasp some of the concepts related to Roy's modified indicators. Elliott also praised Roy for his work; told Roy that Trading System was new, different, and valuable; and mentioned that they should keep the Trading System a secret. Roy referred to his Trading System using the terms "Force," "Fractal Force," or "Fractal Force Indicator." Roy claims that it was his idea to apply these phrases to his Trading System, while Allison Elliott claims that it was her idea.

Elliott was impressed by the Trading System, and invited Roy to be the speaker at a three-day WST seminar to begin on September 18, 2005 in Orlando, Florida ("Joint Seminar"). Roy and Defendants collaborated to create marketing material for the Joint Seminar ("Joint Marketing Materials"). The Joint Marketing Materials announced that "David Elliott's long awaited E-mini Trading class" in Florida would "introduce an exclusive new proprietary trading template which incorporates David Elliott's [SOAP, MOBO, MAP, and SnapBacks] - and the 'Fractal Force Indicator.'" *See, e.g.,* Pl. Ex. 85 at 406, Prelim. Inj. Hr'g. The Joint Marketing Materials also stated that "Day One [of the seminar] will consist of concentrated classroom training with David Elliott and special guest speaker/trainer Claude Roy" and that they would "identify and examine in detail the

three major waves of price in all time-fractals . . ." *Id.* Elliott disseminated his Joint Marketing Materials in his chat rooms and through Mentor Center e-mails.

Before the Joint Seminar, Roy continued to chat with Elliott and refine the Trading System. He also prepared Power Point slide presentations for his portion of the seminar and sent them to Defendants for their review.

On September 18, 2005, the day of the Joint Seminar, Roy (on behalf of Jadael) and Allison Elliott (on behalf of WST) executed a letter of intent ("LOI"), which was drafted by legal counsel for Jadael and WST. Doc. Nos. 65-3, 162 at 4. The LOI delineated which "Intellectual Property and Trade Secrets" belonged to WST, and which belonged to Jadael, and stated that a number of trademarks were Jadael's, including the "Wave Analyzer, the Fractal Force Analyzer, the Snap Back Viewer, and the Fractal Force Indicator." *See* Doc. No. 65-3 at 5-7. The LOI further provided that "[a]ny marketing of Jadael IP and TS under any form . . . cannot be performed without the previous approval of Jadael" and that "WST agrees not to use Jadael's IP and TS without Jadael approval outside the realm of this agreement." *Id.* at 3, ¶¶ 11, 13. Jadael and WST also agreed that the LOI did not "replace" the NDA, but that the LOI "shall supersede the NDA in case of conflict." *Id.* at 3, ¶ 14.

The Joint Seminar was held at the offices of Peregrine Financial Group, Inc. ("PFG"). Twenty-five registered students attended the seminar, and all of them executed non-disclosure agreements prior to attending. PFG also provided computer and audio-visual services for the Joint Seminar and another seminar later in February 2006. Christopher Stettner, a futures broker with PFG who also attended previous WST seminars, did not execute a non-disclosure agreement, and claims that he attended most of the Joint Seminar, with the exception of a short period of time when he left

to fetch doughnuts and coffee for the students, although the extent of his attendance is disputed. Robert Christopher Park, a vice president at PFG who previously worked with Elliott, was in his office at PFG during the Joint Seminar, but he did not attend the entire seminar.  He also did not sign a non-disclosure agreement.  According to Roy, he did not require that Stettner and Park execute non-disclosure agreements because he believed that they were partners with or even worked for Defendants.

Roy taught most of the Joint Seminar.  He did not reveal the precise frequencies of his indicator settings to the students.  He provided the students with his presentation slides and a CD of software ("CD") that offered the students use of his Trading System.  The slides present the Joint Seminar as offered by WST "in conjunction with Jadael, Inc." and as a seminar "featuring" Elliott and Roy.  Pl. Ex. 96 at 1468, Prelim. Inj. Hr'g.  The slides introduce "Fractal Trading," and display Roy's name and "Jadael, Inc." as the "Navigator to your investments."  *Id.* at 1470.  The slides further bear the copyright "2003-2005, Jadael, Inc."  *See id.* at 1471.

The CD displays the phrase "Fractal Force Factor," and a copyright notice for "2005 Jadael Inc. and [WST]."  *Id.* at 1469.  The CD did not disclose the elements of the Trading System to the students.  Roy password- protected the CD, and the password expired after thirty days.  He originally intended to require the students to buy a license to use the CD, but after receiving complaints from the students, he offered them more time to use CD.  He currently allows a small number of students to use the CD for free; he and these students often trade and discuss trades together online.

Roy and Defendants' relationship deteriorated after the Joint Seminar.  They disagreed as to the scope of Defendants' license to use Jadael's Trading System and the method by which

Defendants' planned to market the Trading System and future seminars and products related to the Trading System. Defendants also claim that Roy received negative reviews from the students.

Defendants terminated their relationship with Jadael around September 26, 2005. Prior to the end of the relationship, they advertised a WST seminar in San Jose to begin on October 30, 2005. The marketing materials for that seminar, on which Roy and Defendants had collaborated, were disseminated prior to the end of the parties' relationship.

Elliott claims that after the relationship ended, he made a concerted effort to redesign major aspects of his class and the WST trading system, and that he did so in order to avoid using anything Roy had taught or which might be Jadael's property. Jadael alleges that Elliott suddenly claims to have a "new" trading system and "new" class because he copied Jadael's Trading System.

After the relationship ended, but before the San Jose Seminar, Defendants disseminated a marketing flyer for a WST E-Mini Seminar in Denver, Colorado to be held on December 4, 5, and 6, 2005 ("Denver Seminar"). *See* Doc. No. 65-4. This marketing flyer (the "Denver flyer") was nearly identical to the Joint Marketing Materials, except that it did not mention Roy. *See id.* The Denver flyer announced that WST and Elliott would "introduce an exclusive new PROPRIETARY TRADING TEMPLATE which incorporates David Elliott's SOAP, MOBO, MAP, and SNAPBACKS - the **FRACTAL FORCE FACTOR**!" *Id.* (capital and bold emphasis in original). It further stated that WST and Elliott would be "unveiling several additional brand new studies, such as the "CCI WAVE ANALYZER." *Id.*

Defendants claim that they inadvertently sent out the Denver flyer and that they altered most the marketing materials to avoid using any of Jadael's claimed marks. In Elliott's Mentor Center e-mails, the advertisement is similar to the Joint Marketing Materials and the Denver flyer, but

-10-

Defendants replaced "Fractal Force Factor" with "Fractal Trigger," and "CCI Wave Analyzer" with "CCI Wave Surfer." *See, e.g.,* Pl. Ex. 85 at 122, Prelim. Inj. Hr'g.

In addition to disseminating similar marketing materials, after ending the relationship with Roy, in Hotcomm chat discussions, Elliott discussed concepts and indicators (including the specific settings of the indicators) that were similar to or the same as concepts and indicators from the Trading System. Defendants have held five E-Mini Seminars between October 2005 and October 2006 in which Elliott has taught his "new" trading system.

Neither Jadael nor Roy have formally taught the Jadael Trading System or its concepts since the Joint Seminar. As mentioned above, Roy allows a small group of traders to use his Trading System, but he has not otherwise attempted any business ventures involving marketing his Trading System or teaching his Trading System. He decided not to do so because he wished to await the outcome of this lawsuit, though he has offered no logical explanation for this decision.

Jadael filed this action on October 28, 2005, just over one month after the Joint Seminar and before Defendants held their next seminar, the San Jose Seminar. Doc. No. 1. On June 9, 2006, Jadael filed a motion for preliminary injunction. Doc. No. 65. As support for its motion, Jadael submitted a declaration by Roy, the NDA, the LOI, the Denver flyer, and copies of Elliott-hosted Hotcomm chats dated September 27 and 29, 2005, which Jadael alleges show Defendants' continued use and disclosure of the Trading System and Jadael's marks. *Id.* In his declaration, Roy describes the Trading System and its components, and purports to describe "[t]he heart of my trading system . . ." Doc. No. 65 at 10. On June 23, 2006, without objection from Jadael, Defendants filed the transcript of Roy's deposition (taken in this case on May 23, 2006) in which Roy states describes the concepts underlying and components that comprise his Trading System. Doc. No. 74.

-11-

After a four-day evidentiary hearing on Jadael's motion for preliminary injunction, upon motion by Jadael, the Court ordered sealed certain exhibits presented at the hearing (doc. no. 106), and ordered the portions of the transcript sealed (doc. no. 146). Jadael claims damages due to lost revenue from six seminars conducted by WST between October 2005 and October 2006, as well as the associated software license and Hotcomm charges for the participants of each seminar. Doc. No. 162-5 at 2-3. The motion for preliminary injunction was denied. *See* Doc. No. 100.

Defendants now seek summary judgment on all of Jadael's claims. The Court addresses each claim in the order presented by the Defendants on summary judgment.

## III.   MISAPPROPRIATION OF TRADE SECRETS

Jadael seeks injunctive relief and damages for Defendants' alleged misappropriation of its "trade secrets," which Jadael equates with its "Trading System" in its memorandum in opposition to summary judgment. *See* Doc. No. 136 at 10-14.[3] Under the Uniform Trade Secrets Act (adopted in Florida at Fla. Stat. § 688.01), a "trade secret" is information that: (1) "[d]erives actual or potential independent economic value from not being generally known to, and not being readily ascertainable through proper means by, other persons who can obtain economic value from its disclosure or use"; and (2) "is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."

---

[3]In various filings in the record, Jadael has confusingly dubbed its alleged trade secret Jadael's "Intellectual Property," its "Trading System," or both. *See* Doc. No. 13 at 5,15-16; Doc. No. 162-2 at 3-5; Doc. No. 163 at 12; Doc. No. 163-2 at 10. It appears to the Court that Jadael cannot decide whether it seeks to protect the Trading System or everything on which Roy worked in relation to the Joint Seminar, including alleged trademarks, computer program source code, slides, and even the specific frequency settings of a particular indicator, standing alone. Accordingly, Jadael has yet to provide a precise definition of its trade secret, likely because Jadael's own description of its Trading System – as "made up of information consisting of mathematical and statistical formulas, a compilation of technical indicators, and a method, technique or process to analyze the stock market for buy and sell signals" (doc. no. 136 at 10) – is vague and confusing. Nonetheless, although the Court encountered significant difficulty discerning what exactly Jadael claims is its trade secret (and therefore how exactly Defendants have misappropriated that trade secret), in their motion, Defendants merely presented two arguments that must fail for the purposes of summary judgment.

-12-

Fla. Sta. § 688.002(4).  "Misappropriation" involves the "[d]isclosure or use of a trade secret" without consent by an individual who used "improper means" to acquire the trade secret, or "[a]t the time of disclosure or use, knew or had reason to know that her or his knowledge of the trade secret . . . was [a]cquired under circumstances giving rise to a duty to maintain its secrecy or limit its use."  Fla. Stat. § 688.002(2).  "Improper means" may include by misrepresentation or breach of duty to maintain the secrecy of the trade secret.  Fla. Stat. § 688.002(1).  Information that is generally known or readily available to third parties generally cannot qualify for trade secret protection under Florida law.  *Am. Red Cross v. Palm Beach Blood Bank, Inc.*, 143 F.3d 1407, 1410 (11th Cir. 1995).

Ignoring a number of disputed facts relevant to their arguments and apparently stronger arguments for entitlement to judgment as a matter of law, Defendants only offer two arguments on this claim: (1) that Jadael has "waived any trade secret protection" by failing to maintain its secrecy; and (2) that there is no proof in the record that Defendants misappropriated Jadael's trade secrets. Doc. No. 124 at 6-9.  As discussed below, Defendants failed to meet their burden on summary judgment.

**A.      Reasonable Efforts to Maintain Secrecy**

Defendants specifically argue that by filing in the Court record the June 7, 2006 Declaration of Roy, the NDA, and the LOI (all of which, according to Defendants, disclose "the essence of the trading system"), "Roy" (not Jadael) "lost [trade secret] protection by not taking reasonable steps to protect the secrecy of his trading system."[4]  Doc. No. 124 at 7.  Strangely, Defendants did not mention nor cite to Jadael's failure to object to the filing of Roy's deposition transcript, a filing which includes a significantly more detailed explanation of the Trading System.  *See* Doc. No. 74-4.  Defendants also

---

[4]Defendants also refer to Jadael's "trade secrets" as Jadael's "trading system," and never challenge Jadael's vague definition of its alleged trade secret.

-13-

argue that because Stettner and Park attended the joint seminar and were not required to sign non-disclosure agreements, "[t]herefore Jadael and Roy should not be entitled to protection for its alleged trade secrets."  Doc. No. 124 at 7.

Whether the trade secret was the subject of reasonable efforts under the circumstances to maintain its secrecy is a fact-intensive determination.  *See Lear Siegler, Inc. v. Ark-Ell Springs, Inc.*, 569 F.2d 286, 289 (5th Cir. 1978) ("[t]he term 'trade secret' is one of the most elusive and difficult concepts in law to define") (*Furmanite Am., Inc. v. T.D. Williamson, Inc.*, 2007 WL 1111254 at *5 (M.D. Fla. 2007) ("Courts are extremely hesitant to grant summary judgment regarding the fact-intensive questions of the existence of a trade secret or whether a plaintiff took reasonable steps to protect its trade secrets"); *Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 9 F.3d 823, 849 (10th Cir. 1003) (post-hearing measures to protect confidentiality showed "continuing intent to maintain the secrecy" and information retained its "status as trade secrets"); *Navarro v. Eskanos & Adler*, 2007 WL 902550 at *11 (N.D. Cal. 2007) (filing document with court did not operate as an automatic waiver).  According to Defendants, however, the Court filings and alleged disclosure to Stettner and Park entitle Defendants to judgment as a matter of law that Jadael's trade secret was not the subject of reasonable efforts under the circumstances to maintain its secrecy.  In so arguing, Defendants failed to mention a number of facts, some of which are clearly disputed, and others of

which weigh in favor of Jadael, for the purposes of summary judgment.[5]  Defendants have pointed

to significant evidence of Jadael's lack of effort, but the ultimate determination must be made at trial.

### B.    Proof of Misappropriation

Defendants next state that there is no proof that "Elliott" misappropriated Jadael's trade

secrets, or that "Defendants" misappropriated Jadael's software or source codes.  Doc. No. 124 at 7-8.

As support, Defendants point only to the testimony of Elliott in which he denies that he

misappropriated Jadael's trading system; and testifies that the password expired on the CD containing

Jadael's software so that Elliott could not use the software or view the source code.  *Id.*

Defendants' arguments are deficient for the purposes of this motion.  First, Jadael did not

merely allege misappropriation its software of source codes.  Jadael has alleged that Roy revealed his

Trading System to Elliott in months of internet chats before the Joint Seminar; that Elliott disclosed

portions of Jadael's Trading System in Hotcomm and TCNet chats; that Defendants copied Jadael's

Trading System by using indicators that mimic Jadael's; that Defendants are therefore using and

teaching what is essentially Jadael's Trading System; and that Defendants' use of marketing material

containing a similar description to that used for the Joint Seminar is evidence that Defendants did

copy Jadael's Trading System.  *See, e.g.,* Doc. No. 163.  Defendants, however, did not address any

of these allegations.

---

[5]For example, Jadael did not disclose the "trading system" until Elliott signed the NDA on behalf of himself and WST; all of the students who attended the Joint Seminar were required to sign non-disclosure agreements; Diane Duffey, a student at the Joint Seminar, testified that Stettner and Park did not attend the seminar and that they were only in the classroom for brief periods of time ( Tr. of Prelim. Inj. Hr'g Aug. 1, 2006 at 159-60); Roy testified that he did not require Stettner and Park to sign non-disclosure agreements because he thought they were associates of WST (Tr. of Prelim. Inj. Hr'g Aug. 7, 2006 at 102-04); and much of the transcript and exhibits from the Preliminary Injunction Hearing have been sealed, upon motion by Jadael's counsel (*see* doc. nos. 102, 106).  In addition, Roy avers that the documents that have been publicly filed with the Court do not disclose Jadael's trade secret "in full or in sufficient detail to allow replication."  Doc. No. 127 at 3, ¶ 7.

Next, misappropriation may occur even where the defendant did not use or disclose the alleged trade secret in its original form, and a defendant is liable for use of a trade secret "with independently created improvements or modifications if the result is substantially derived from the trade secret . . ." *See* RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 40 cmt. c (1995).[6]; *see also Real-Time Labs, Inc. v. Predator Sys.*, 757 So.2d 634, 637 (Fla. Ct. App. 2000) (citing Seventh Circuit case law). Defendants may not be able to *use* the password-protected software and source code, but this fact is not dispositive of the claim.  Defendant's motion for summary judgment on the trade secrets claim is therefore denied.

## IV.    UNFAIR COMPETITION

Defendants next move for summary judgment on Jadael's unfair competition claim. Defendants make two main arguments: that some of Jadael's marks are not distinctive and therefore not deserving of protection; and that the rest of the marks might be entitled to protection, but no likelihood of confusion as to the proper origin of the marks exists because neither Defendants nor "Roy" are currently using the marks.  Doc. No. 124 at 9-13.

The Lanham Act, 15 U.S.C. § 1125(a), provides protection for marks, even in the absence of federal trademark registration.[7]  *Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188, 1193

---

[6]In *Penalty Kick Mgmt. Ltd. v. Coca Cola Co.*, 318 F.3d 1284 (11th Cir. 2003), the Eleventh Circuit cited to the RESTATEMENT in analyzing the Georgia Trade Secrets Act (a similar statute to Florida's), noting that the Supreme Court of Georgia had relied heavily on the RESTATEMENT in doing the same. *Id.* at 1290-93.  Courts in Florida have also cited to the RESTATEMENT in addressing trade secrets under the Florida statute.  *See, e.g., Bestechnologies, Inc. v. Trident Environmental*, 681 So.2d 1175, 1176 (Fla. Ct. App. 1996).

[7]        The Lanham Act provides, in relevant part:

(1) Any person who, on or in connection with any goods or services, . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or

-16-

(11th Cir. 2001) (citing § 1125(a) and *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992)).  To prevail on a claim of unfair competition under this section, Jadael must show: (1) that it had prior rights to the pertinent marks, and (2) that Defendants "adopted a mark or name that was the same, or confusingly similar to its mark, such that consumers were likely to confuse the two." *See Planetary Motion, Inc.*, 261 F.3d at 1193.

### A.   Prior Rights in the Mark and Distinctiveness

An individual acquires ownership rights to a trademark only through actual prior use in commerce.  *Planetary Motion*, 261 F.3d 1188, 1193 (11th Cir. 2001).  "Use in commerce" is defined broadly,[8] and Defendants do not argue this issue on summary judgment.

Defendants instead argue that Jadael's alleged marks, the "Wave Analyzer, CCI Wave Analyzer, Snap Back Viewer, and Binary Viewer" are not sufficiently distinctive enough to deserve protection.  *See* Doc. No. 124 at 10.  As a preliminary issue, in order to receive protection, a mark must be distinctive – either inherently or by acquiring distinctiveness through secondary meaning.

---

> her goods, services, or commercial activities by another person, or
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).

> [8]"Use in commerce" is defined as:
>
> the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark . . . . [A] mark shall be deemed to be in use in commerce . . . on goods when (A) it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, and (B) the goods are sold or transported in commerce . . . .

*Planetary Motion, Inc.*, 261 F.3d 1188, 1194 (citing the Lanham Act, 15 U.S.C. § 1127).

*Two Pesos, Inc.*, 505 U.S. at 769.  Marks are commonly classified in categories in order of decreasing distinctiveness: arbitrary or fanciful, suggestive, descriptive, and generic.  *See id.* at 768; *accord Univ. of Ga. Athletic Ass'n v. Laite,* 756 F.2d 1535, 1540 (11th Cir. 1985).  Arbitrary marks, which involve a word used in relation to service or product unrelated to that word's meaning, and suggestive marks, which "subtly connote something about the service [or product] so that a consumer could use his or her imagination and determine the nature of the service [or product]," are both inherently distinctive and therefore deserving of trademark protection. *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1537 n.20 (11th Cir. 1986).  Generic marks, which describe the type of service of product, never receive protection.  *Id.*  Descriptive marks, which "directly describe a characteristic or quality of the service [or product]," are protected only when they have become distinctive of the claimant's use of them in commerce, or, in other words, when they have acquired "secondary meaning."  *Id.*

**B.     Likelihood of Confusion**

Next, in their motion, Defendants do not argue that the trademarks "Fractal Force Analyzer, Fractal Force Indicator, and Fractal Force" are neither suggestive nor arbitrary.  Instead, Defendants argue that "there is no likelihood of confusion among consumers."  *See* Doc. No. 124.  The Court considers the following seven factors in assessing whether or not a likelihood of consumer confusion exists: (1) type of mark; (2) similarity of mark; (3) similarity of the products the marks represent; (4) similarity of the parties' clients and retail outlets; (5) similarity of advertising media; (6) Defendants' intent; and (7) actual confusion. *Lone Star Steakhouse & Saloon, Inc. v. Longhorn Steaks, Inc.*, 122 F.3d 1379, 1282 (11th Cir. 1997).  Of these, factors the type of mark and the evidence of actual confusion are the "most important."  *Dieter v. B&H Indus. of Southwest Fla., Inc.*, 880 F.2d 322, 326 (11th Cir. 1989), *cert. denied*, 498 U.S. 950 (1990)).

### C.    Defendants' Motion

Defendants arguments fail on summary judgment for a number of reasons.  First, even assuming that all of the marks are merely descriptive, genuine issues of material facts remain for resolution as to whether the marks acquired secondary meaning.  Jadael may have used these marks only once, but the record shows that the Joint Seminar was marketed to thousands of people through the Mentor Center and TCNet.  The copyright designations on the Joint Seminar CD and presentation materials evidence *some* attempt to attribute certain marks to Jadael.  Jadael's limited use of the marks in the past and failure to use the marks currently certainly weigh against Jadael, but not for the purposes of summary judgment.

Furthermore, numerous factual disputes remain regarding the likelihood of confusion.  While "actual confusion" is the most *important* factor, the other factors remain and cannot be weighed at this juncture.  Certainly, the parties' products, clients, and industries are extremely similar; the marks used in the Denver flyer are identical; and Jadael claims that it *plans* to use the marks in the future.  Again, while a great many factors do not favor Jadael, summary judgment cannot be granted on this claim.

## V.    FRAUDULENT INDUCEMENT

Defendants also seek summary judgment on Jadael's claim of fraudulent inducement, arguing, generally, that Jadael "has not brought forward any evidence indicating it was fraudulently induced to do anything."  Doc. No. 124 at 13.  In his amended complaint and a declaration submitted in response to the summary judgment motion, Roy lists Elliott's alleged misrepresentations, namely regarding Defendants' contacts in the investment industry and how those contacts would contribute to the success of a joint venture between Defendants and Jadael.  Doc. No. 13 at 21, ¶¶ 88-89 (amended complaint); Doc. No. 137 at 1-2, ¶ 2 (Roy declaration).  Jadael alleges that Defendants

-19-

made these specific misrepresentations of material fact in order to induce Jadael, through Roy, to disclose its proprietary information – information that Defendants actually intended to misappropriate for their own use, Jadael claims.  *See* Doc. Nos. 13, 137.

Under Florida law, fraud in the inducement requires proof of: (1) a false statement concerning a material fact, (2) that the defendant knew or should have known was false, (3) the defendant's intention that the statement induce plaintiff's reliance, and (4) consequent injury suffered by the plaintiff by acting in reliance on the statement. *Wadlington v. Cont'l Med. Servs., Inc.*, 907 So.2d 631, 632 (Fla. 4th DCA 2005); *Virkler v. Herbert Enters., Inc.*, 403 F. Supp. 2d 1141, 1150 (M.D. Fla. 2005) (quoting *Wadlington*); *Bradley Factor, Inc. v. United States*, 86 F.Supp.2d 1140, 1146 (M.D. Fla. 2000).  "[W]here the promise to perform a material matter in the future is made without any intention of performing or made with the positive intention not to perform," Florida case law creates an exception to the general rule that "a false statement of fact . . . must be of a past or existing fact, not a promise to do something in the future." *Wadlington*, 907 So.2d at 632 (quoting *Vance v. Indian Hammock Hunt & Riding Club, Ltd.*, 403 2d. 1367, 1371 (Fla. 4th DCA 1981)).

As alleged by Jadael, the fraudulent inducement claim is based on several statements made by Elliott between July 1 and July 4, 2005, prior to the execution of the NDA on July 7, 2005.  Doc. No. 13 at 21, ¶¶ 88-89 (amended complaint); Doc. No. 137 at 2 (Roy declaration).  The statements can be grouped into categories, as follows: (1) that Defendants were affiliated with, partners or, and/or had a "valuable" relationship with Anthony Robbins, E-Trade Financial, Peregrine Financial Group, Inc., and 21st Century Investor Education, Inc.; (2) that these relationships would guarantee Jadael's immediate success in the joint venture with Defendants; (3) that E-Trade Financial and PFG would assist Defendants and Jadael in the future by promoting the joint seminars; and (4) that E-Trade

-20-

Financial had already budgeted money for the joint venture, provided marketing contacts to Defendants, and would provide assistance in the future.[9]

All of the statements, in particular, those in categories (1) and (2), are extremely vague. The statements in category (1) can be interpreted as merely statements of opinion, and the statements in categories (2) and (3) (and to some extent, category (4)) are comments about what *other non-parties* would do in the future. None of these representations are actionable as fraud, and Jadael has not shown otherwise.[10] As a matter of law, the claim of fraudulent inducement fails.

Furthermore, the record contains no evidence that any of these statements were false or that Defendants knew or should have known that they were false. The only support for the fraud claim is Roy's January 2 Declaration, in which he concludes, vaguely, that "Defendants made numerous misrepresentations to me[,]" and then summarizes Elliott's alleged statements. Doc. No. 137 at 1-2,

---

[9]Some of the statements fit into more than one category. In its amended complaint, Jadael claims that Elliott made the following statements: (1) that "because of Defendants' affiliation with Anthony Robbins, thousands of individuals were ready for Defendants' and [Jadael's] seminars . . ."; (2) that "because of Defendants' affiliation with Anthony Robbins, PFG, and E-Trade, Defendants could guarantee Jadael that they had a 'huge market' that was 'ready now'"; (3) "that E-Trade and PFG would promote Defendants and Jadael's seminars"; (4) "that E-Trade had 'already budgeted big [money]' for Defendants and Jadael to teach"; and (5) that "Defendants had already received three to four hundred thousand marketing names and addresses from E-Trade and that E-Trade should 'funnel several hundred thousand over the next year or so." Doc. No. 13 at 21, ¶¶ 88-89.

The statements in Roy's affidavit dated January 2, 2007 are similar but slightly different: (1) that "Elliott represented that he and WST had a partnership and valuable business relationship with numerous entities in the trading field, such as E-Trade Financial, Anthony Robbins, Peregrine Financial Group, Inc., and 21st Century Investor Education, Inc."; (2) that "Elliott further represented that these business relationships would allow me [Roy] to instantly and successfully market my trade secrets and intellectual property to thousands of individuals in the industry"; (3) that "Elliott represented . . . that thousands of individuals were ready for our joint seminars, that because of his and WST's affiliation with Anthony Robbins, PFG, and E-Trade, they could guarantee me that they had a 'huge market' that was 'ready now,' that E-Trade and PFG would promote our seminars; and that E-Trade had already budgeted big money for us to teach"; and (4) that "Elliott represented . . . that Defendants had already received nearly three to four hundred thousand marketing names and addresses from E-Trade and that E-Trade should 'funnel several hundred thousand over the next year or so'" Doc. No. 137 at 2.

[10]It appears that Jadael attempted to refashion its claims of the NDA as a claim for fraudulent inducement. Of course, fraudulent inducement is a claim independent of a breach of contract claim, and a plaintiff may bring an action for both on the same contract. *See HTP, Ltd. v. Lineas Aeras Costarricenses, S.A.*, 685 So.2d 1238, 1239 (Fla. 1996). The current case, however, presents a different issue – a fraudulent inducement claim that was not supported by any evidence in the record because Jadael's only (arguably) supportable claim was for breach of contract.

¶ 2.  Roy never clearly states that the statements were false and did not otherwise explain his basis for concluding that these statements were "misrepresentations."  As "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion," Jadael's claim fails for lack of proof.  *See Ellis v. England*, 432 F.3d 1321, 1325-26 (11th Cir. 2005) (citation omitted).

## VI.    BREACH OF THE LOI

Jadael alleges that WST breached the LOI by "continuing to use, disclose, and market Jadael's Intellectual Property without the approval or permission of Jadael."  Doc. No. 13 at 14, ¶ 58. Similarly, and *on the basis of the same factual allegations*, Jadael also claims that Elliott and WST breached the NDA by, among other things, "willfully continuing to use and disclose Jadael's Intellectual Property without authorization or permission."  *Id.* at 12, ¶ 49.  Although Jadael brings the two as separate counts, through the admission of counsel, the only viable claim arises under the NDA.[11]

The elements of a breach of contract action are: (1) a valid contract, (2) a material breach, and (3) damages.  *J.J. Gumberg Co. v. Janis Servs., Inc.*, 847 So.2d 1048, 1049 (Fla. 4th DCA 2003).  "In breach of contract actions, a plaintiff may recover only if the damages were a proximate result of the breach."  *Chipman v. Chonin*, 597 So.2d 363, 364 (Fla. 3d DCA 1992) (citing *Tuttle/White Constructors, Inc. v. Montgomery Elevator Co.*, 385 So.2d 98 (Fla. 5th DCA 1980)).  During oral argument on this motion, counsel for Jadael admitted that the damages from the breach of the LOI

---

[11]In its trial brief, Jadael even presents the breach of the NDA and breach of the LOI as one claim covering the same arguments.  *See* Doc. No. 163 at 9.

were <u>not different</u> from those it sustained from breach of the NDA.[12]  Jadael, thus, cannot prove that the damages were the proximate cause of breach of the LOI, not the NDA.  Indeed, as with the claim for fraudulent inducement, it appears that Jadael has attempted to refashion its NDA claim as an extra claim – one which fails as a matter of law.  Summary judgment is therefore warranted on the basis of Jadael's own position regarding the LOI.

## VII.    BREACH OF THE NDA

In addition to alleging continued use and disclosure of Jadael's "Intellectual Property," Jadael also alleges that WST breached the NDA by: (1) "failing to return to Jadael all documents, materials, and software containing or constituting Jadael's Intellectual Property"; and (2) "failing to erase all Jadael software and coded material on their computers."  Doc. No. 13 at 12, ¶ 49.  In their summary judgment motion, Defendants, again, present weak and cursory arguments without a single citation to the record to support its factual statements.  *See* Doc. No. 124 at 16-17.  Defendants merely denied the existence of documents, materials, or software that needed to be returned to Jadael; denied using any of Jadael's "Intellectual Property" (with the exception of "mistakenly" disseminating the Denver flyers); denied that they were required to erase the software and coded material because it was inaccessible and password protected after thirty days; and concluded that Jadael's "intellectual property" is now part of the public domain as a result of the Court filings.  *See id.*

---

[12]Statements made by an attorney during oral argument are binding judicial admissions and may form the basis for deciding summary judgment.  *See,* Fed. R. Civ. P. 56(c) ("The judgment shall be rendered forthwith if the pleadings depositions, answers to interrogatories, and *admissions on file*, together with the affidavits, if any, show that there is no genuine issues as to any material fact. . . .") (emphasis added); *Geller v. Prudential Ins. Co. of Am.*, 237 F. Supp. 2d 210, 220 (E.D. N.Y.) (awarding partial summary judgment based on counsel's concessions at oral argument);  *cf., Crowe v. Coleman,* 113 F.3d 1536, 1542 (11th Cir. 1997) (unequivocal concessions and admissions of counsel at oral argument in appellate courts can count against the party represented by counsel); *Kohler v. Inter-Tel, Inc.*, 244 F.3d 1167, 1170 n. 3 (9th Cir. 2001) (*citing United States v. Wilmer*, 799 F.2d 495, 502 (9th Cir. 1986) (attorney's statement during oral argument constitutes judicial admission)); *McCaskill v. SCI Mgmt. Corp.*, 298 F.3d 677, 680 (7th Cir. 2001) ("The verbal admission by [defendant's] counsel at oral argument is a binding judicial admission, the same as any other formal concession made during the course of proceedings.").

The arguments raised by Defendants fail to support entitlement to summary judgment.  As stated above, the elements of a breach of contract claim include a valid contract, a material breach, and damages, and numerous factual issues remain regarding each of these elements.  Defendants never deny that they did *not* the software, nor that they were obligated to do so under the NDA.[13]  Further, Defendants, again, ignore Jadael's actual claims in this case.  Jadael alleges that Defendants have used or disclosed some or most of the "Proprietary Information" listed in the NDA by disclosing some of it in chatrooms, and by creating and teaching a trading system that mimics Jadael's.  Defendants have presented nothing to counter these allegations.

## VIII.   CONCLUSION

As discussed at various points above, Defendants, for the most part, failed to carry their burden on summary judgment.  Defendants failed to do so, despite having had the advantage of an extended evidentiary hearing on most of the same issues.  Therefore, for the reasons stated above, Defendants' Motion for Summary Judgment (Doc. No. 124) is **GRANTED** as to Jadael's claims for misappropriation of trade secrets and breach of the LOI (Counts II and III) and **DENIED** as to Jadael's remaining claims (Counts I, IV, and V).

**DONE** and **ORDERED** in Orlando, Florida on August 29, 2007.

*David A. Baker*

DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record

---

[13]For instance, Defendants never observed that the NDA actually states that the Proprietary Information must be returned and the software and coded material shall be erased "upon the termination of the *Agreement*."  Doc. No. 24-2 at 2, ¶ 8 (emphasis added).

-24-